UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER LAWRENCE SMITH,<br><br>Defendant. | No. 1:21-cr-00136-DAD-BAM<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br>(Doc. No. 30) |

This matter is before the court on defendant's motion to suppress all evidence obtained by the government as a result of its search of his storage unit on August 12, 2020. (Doc. No. 30.) Defendant filed the pending motion on April 25, 2022 pursuant to Federal Rule of Criminal Procedure 12, Eastern District of California Local Rule 430.1, and the Fourth Amendment of the United States Constitution. (*Id.* at 5.) The government filed an opposition to that motion to suppress evidence on May 13, 2022, and defendant filed his reply thereto on May 23, 2022. (Doc. Nos. 33, 34.)

The court held hearings on defendant's motion on May 31, 2022 and September 6, 2022, at which Assistant Federal Defender Christina Corcoran appeared on behalf of defendant and Assistant United States Attorney Joseph Barton appeared on behalf of the government. (Doc. Nos. 35, 43.) At the conclusion of the September 6, 2022 hearing, the court directed the government to file an affidavit or declaration from the law enforcement officer who executed the

1

search warrant in question and set a deadline for defendant to respond and clarify whether he was requesting an evidentiary hearing in connection with the pending motion. (Doc. No. 43.) On September 13, 2022, the government filed the declaration of United States Postal Inspector Daniel Croonquist (the "Croonquist declaration"). (Doc. No. 47.) On September 23, 2022, defendant filed a response stating that he did not believe an evidentiary hearing was required, in light of the Croonquist declaration, but requested that the court set a supplemental briefing schedule and allow further briefing addressing the issues raised at the hearing. (Doc. No. 53 at 2–3.) On September 25, 2022, the government filed a reply to defendant's request, arguing that further briefing was not needed. (Doc. No. 54.) Nevertheless, consistent with the court's representations to counsel for the parties at the hearing, the court set a deadline for defendant to file a supplemental brief and for the government to file either a supplemental brief of its own, or a statement of its intent to not file one. (Doc. No. 55.) On October 4, 2022, defendant filed a supplemental brief as permitted by the court. (Doc. No. 57.) The next day, the government filed a notice of its intent to not file further supplemental briefing. (Doc. No. 58.) Accordingly, the pending motion to suppress was taken under submission for decision on October 5, 2022.

For the reasons explained below, the court will deny defendant's motion to suppress evidence, specifically the 12-gauge shotgun that officers seized during their search of his storage unit.

**BACKGROUND**

On July 17, 2020, defendant Christopher Lawrence Smith was arrested by the California Highway Patrol ("CHP") pursuant to an active felony state warrant and also for driving under the influence. (Doc. Nos. 30 at 7; 33 at 2.) CHP searched defendant's car and found incriminating evidence of mail theft, including suspected stolen mail, checks, access devices, and counterfeit postal keys that could be used to access community mailboxes. (Doc. Nos. 30 at 7; 33 at 2; 47 at ¶ 8.) CHP referred the evidence to the United States Postal Inspection Service ("USPIS"), who then began investigating defendant for federal mail theft and financial fraud. (Doc. No. 33 at 2.)

The USPIS's investigation included having Inspector Croonquist review the phone calls defendant made from the King's County Jail, where he was detained following his arrest by CHP.

2

(Doc. Nos. 30 at 7; 33 at 3.) During two phone calls defendant made to his father and his girlfriend in July and August 2020, defendant offered to give his father a 12-gauge shotgun that was in defendant's storage unit, which his girlfriend could access. (Doc. Nos. 30 at 7; 33 at 3.) According to Inspector Croonquist:

> In a phone call from July 31, 2020 to his girlfriend and father, [defendant] told his father he had a storage unit which contained a 12-gauge shotgun. [Defendant] offered to give his firearm to his father if he wanted it and was adamant that the firearm was not stolen. [Defendant] told his father that if he (his father) did not want the firearm then he would have his girlfriend sell it. [Defendant] continued to tell his father the firearm was not stolen and he could check on it if he wanted to. The father accepted [defendant's] offer to take the firearm as long as it was not stolen.
>
> During another jail phone call from August 8, 2020 to his father, [defendant] asked his father again if he wanted the shotgun. [He] again told his father the firearm was not stolen and that if he did not want it he would get rid of it somewhere else. His father stated he would take the firearm. [Defendant] told his father that his girlfriend also had access to the storage unit the firearm was in.

(Doc. No. 30-1 at ¶¶ 14–15; 47 at ¶ 4.) Inspector Croonquist completed a background check into defendant's criminal history and learned that he had a suffered felony conviction in 2017 for being a convicted felon in possession of a firearm and for selling narcotics. (Doc. No. 30-1 at ¶ 19.)

On August 10, 2020, Postal Inspectors Croonquist and Louie Martinez located a storage facility approximately one mile from defendant's girlfriend's residence. (Doc. No. 30-1 at ¶ 16.) They traveled to the facility and confirmed with the facility's manager that defendant rented unit 467 at that facility. (*Id.*) According to the facility's manager and the facility's records, defendant had paid his rent for the storage unit on July 13, 2020 (four days before his arrest), and no one had accessed the unit after August 8, 2020 (the day of his second jail phone call referencing the shotgun). (*Id.* at ¶¶ 16–17.) On August 11, 2020, Inspector Croonquist returned to the facility and informed the facility's personnel that he had reason to believe that defendant's unit contained a firearm (which was against the facility's policies), and that law enforcement agents intended to obtain a warrant to search the storage unit. (*Id.* at ¶ 18.) The personnel at the facility froze defendant's access code so that he could not gain entry to the unit. (*Id.*)

The USPIS coordinated with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") to obtain a search warrant for defendant's storage unit based on the belief that there was probable cause to believe that defendant was in violation of 18 U.S.C. § 922(g) (prohibited person in possession of a firearm or ammunition). (Doc. No. 33 at 3.) On August 11, 2020, ATF special agent Eric Penman applied for a search warrant for defendant's storage unit supported by his affidavit setting forth the facts upon which the application was based.[1] (Doc. No. 30-1 at 2–12.) Inspector Croonquist and Agent Penman drafted the search warrant affidavit together, although Agent Penman was the affiant who signed the affidavit and application. (*Id.* at 2, 11.) The affidavit included two attachments, Attachment A, which described the storage unit location to be searched, and Attachment B, which listed the items to be searched for and seized. (*Id.* at ¶¶ 6, 7, 23, 24; *id.* at 12–13.) Attachment B listed the following three categories of items to be searched for and seized:

> 1. Records, documents, and items that constitute evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Section 922(g)(1).
>
> 2. Firearms and ammunition.
>
> 3. Any locked safe or physical storage device within the premises described in Attachment A that is capable of holding items enumerated elsewhere in Attachment B, which law enforcement agents cannot reasonably open on-site and that agents need to remove off-site to open and examine the contents.

(*Id.* at 13.) Attachment B did not list a shotgun specifically. However, paragraph 7 of Agent Penman's affidavit in support of the issuance of the warrant stated that "[t]he search shall include the search and seizure of a firearm described as a '12-gauge shotgun' and any other items described in Attachment B," and paragraph 21 thereof stated "[b]ased on [Agent Penman's] training and experience, 12-gauge shotguns and other firearms are commonly stored together with or in proximity to ammunition." (*Id.* at ¶¶ 7, 21.)

On the evening of August 11, 2020, the magistrate judge on duty issued the requested search warrant for defendant's storage unit (No. 5:20-sw-00085-JLT). (Doc. Nos. 33 at 10; 47 at

---

[1] The factual background in this order is derived in large part from the facts set forth in that affidavit.

1  ¶ 4.) The warrant was issued using an "AO 93" form, which is the form provided by the

2  Administrative Office of U.S. Courts for use in the issuance of a "search and seizure warrant."

3  (Doc. Nos. 33 at 10.) The search warrant stated that Attachments A and B were attached thereto

4  and were incorporated by reference, and the search warrant also included the boilerplate language

5  pre-printed on the AO93 form that "[the signing judge] find[s] that the affidavit(s), or any

6  recorded testimony, establish probable cause to search and seize the person or property described

7  [in the warrant]." (Doc. No. 33 at 10.) It is undisputed by the parties that Agent Penman's

8  supporting affidavit was not physically attached to the search warrant at the time of its execution.

9  (Doc. No. 57 at 2.)

10  Shortly after the warrant was issued, Inspector Croonquist received an email from

11  Assistant United States Attorney Joseph Barton that included electronic PDF copies of both the

12  search warrant (with Attachments A and B) and Agent Penman's supporting affidavit. (Doc. No.

13  47 at ¶ 5.) That night, Inspector Croonquist opened and reviewed those PDF documents. (*Id.*)

14  Early the next morning, on August 12, 2020, Inspector Croonquist led a briefing with fellow

15  Postal Inspectors Martinez and Erik Miranda, during which they reviewed an operational plan

16  that Inspector Croonquist had prepared. (*Id.* at ¶ 6.) The first page of that operational plan

17  specified that their objective was to "[e]xecute search warrant and recover items/evidence listed

18  in Attachment B, specifically a 12-gauge shotgun," and Inspector Croonquist also told

19  "Inspectors Martinez and Miranda at the briefing that the objective was to execute the search

20  warrant and seize a 12-gauge shotgun." (Doc. Nos. 47 at ¶ 6; *id.* at 24.)

21  Later that morning, Inspectors Croonquist, Martinez, and Miranda executed the search

22  warrant and found and seized a 12-gauge shotgun. (Doc. Nos. 33 at 11; 47 at ¶ 8.)[2] During the

23  execution of the search, the inspectors had a hard copy of the search warrant with them. (Doc.

24  No. 47 at ¶ 7.) Inspector Croonquist cannot recall whether they also had a hard copy of Agent

25  Penman's supporting affidavit, but he had electronic access on his USPIS-issued cell phone to the

26  PDF copy of the affidavit that had been emailed to him the day before. (Doc. No. 47 at ¶ 7.)

27
28  [2] During the search, the inspectors also found and seized six United States Postal Service ("USPS") community mailbox locks. (Doc. No. 33 at 11.)

**LEGAL STANDARD**

The Fourth Amendment states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  The Fourth Amendment further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.*  Pursuant to Rule 41 of the Federal Rules of Criminal Procedure, "[a]fter receiving an affidavit or other information, a magistrate judge . . . must issue the warrant if there is probable cause to search for and seize a person or property . . . ." Fed. R. Crim. P. 41(d).  "[T]he role of the magistrate is to determine whether, 'given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Greenstreet v. Cnty. of San Bernardino*, 41 F.3d 1306, 1309 (9th Cir. 1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The facts presented to the magistrate judge "must be sufficient to justify a conclusion that the property which is the object of the search is probably on the premises to be searched at the time the warrant is issued." *United States v. Greany*, 929 F.2d 523, 524–25 (9th Cir. 1991).  The magistrate judge's probable cause determination is entitled to deference by reviewing courts whose duty "is simply to ensure that the magistrate had 'a substantial basis for concluding' that probable cause existed." *Gates*, 462 U.S. at 238–39 (citation and alteration omitted); *see also United States v. Kia*, 170 F. App'x 457, 459 (9th Cir. 2006)[3] ("A magistrate judge's finding of probable cause to support a search warrant is entitled to great deference.").

As the Ninth Circuit has recognized that, "[i]n order for a search to be reasonable, the warrant must be specific," and has observed that "[s]pecificity has two aspects:  particularity and breadth." *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856 (9th Cir. 1991). "Particularity is the requirement that the warrant must clearly state what is sought," *id.*, and "[t]he description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized," *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir.

---

[3] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1986). "Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based," i.e., by "requir[ing] that there be probable cause to seize the particular thing named in the warrant." *In re Grand Jury Subpoenas*, 926 F.2d at 857. These requirements taken together "prevent[] a 'general, exploratory rummaging in a person's belongings.'" *Id.* (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)).

## ANALYSIS

In his pending motion, defendant Smith moves to suppress all evidence seized as a result of the inspectors' search of his storage unit, specifically the 12-gauge shotgun.[4] (Doc. No. 30 at 6.) According to defendant, the search warrant was facially invalid because it was overbroad and lacked particularity. (*Id.*) Defendant argues that "the court must suppress the evidence obtained from the warrant's execution" "[b]ecause the warrant did not mention a shot gun, and there was no probable cause to believe that the storage unit contained any of [the] overbroad categories of items [listed in Attachment B]." (*Id.*) Defendant's argument relies upon viewing the warrant with the two Attachments A and B but *without* consideration of the underlying affidavit. Specifically, defendant contends that: (1) the underlying affidavit was not incorporated by

---

[4] Defendant's initial briefing urged suppression of "all evidence obtained," "the evidence obtained," and "the associated evidence." (Doc. Nos. 30 at 6, 14; 34 at 6.) However, defendant does not specifically address the USPS postal locks in his pending motion, which were the only other items seized from defendant's storage unit. For its part, the government characterizes the postal locks as "surplusage" evidence because the government already had plenty of mail-related evidence. (Doc. No. 33 at 3 n.2.) The government further noted that the locks were seized because they were in plain view, and "no one besides authorized postal employees are allowed to possess" them. (*Id.*) At the hearings on the pending motion, the court requested defense counsel to clarify what evidence defendant sought to suppress (the shotgun, the postal locks, or both). Defense counsel offered some clarification, stating that the shotgun was "the main thing" that defendant seeks to suppress (Doc. No. 35), and "it is true that the primary reason for the motion would be suppression of the shotgun," (Doc. No. 48 at 10). But defense counsel appeared reluctant to explicitly limit defendant's motion to suppression of the shotgun. Then, in post-hearing briefing, defendant maintained his position that "total suppression is the proper remedy" (Doc. No. 57 at 10), but again did not specifically address the postal locks or provide any distinct basis for suppressing the postal locks. For these reasons, the court construes defendant's motion to suppress as limited to defendant seeking suppression of the shotgun. Notably, even if the court were to construe defendant's motion as seeking to suppress the shotgun and the postal locks, defendant has not offered any counterargument to the government's explanation that the locks were found in plain view by the inspectors who were executing the search warrant and searching in containers that could have contained the shotgun and/or ammunition for the shotgun.

1 reference into the search warrant, and (2) Inspector Croonquist's having electronic access to a
2 PDF copy of the affidavit on his cell phone is insufficient to show that the affidavit
3 "accompanied" the search warrant because the inspectors did not actually access the affidavit
4 during the search. (*Id.* at 2, 9–10.) However, under Ninth Circuit precedent, defendant's
5 contentions fail on both prongs.

6 According to binding precedent in this circuit, the boilerplate language appearing on the
7 pre-printed AO 93 form search warrant that "[the signing judge] find[s] that the affidavit(s), or
8 any recorded testimony, establish probable cause to search and seize the person or property
9 described [in the warrant]," (Doc. No. 33 at 10) constitutes "suitable words of reference" for the
10 warrant to have expressly incorporated the affidavit. *See United States v. SDI Future Health,*
11 *Inc.*, 568 F.3d 684, 699 (9th Cir. 2009); *see also United States v. Vesikuru*, 314 F.3d 1116, 1121
12 (9th Cir. 2002); *United States v. Towne*, 997 F.2d 537, 545 (9th Cir. 1993). In addition, under
13 Ninth Circuit precedent, an affidavit "accompanie[s] the warrant" where the affidavit is made
14 available to the officers executing the search warrant, i.e., that the officers could access the
15 affidavit during the search, though importantly, "actual reliance on [the] affidavit" is not required.
16 *SDI Future Health, Inc.*, 568 F.3d at 701 (citing *Towne*, 997 F.2d at 548). Here, there is no
17 dispute that Agent Penman's supporting affidavit was available to the inspectors executing the
18 search. As summarized above, during the search, Inspector Croonquist had electronic access on
19 his cell phone to the emailed PDF copy of the affidavit—the affidavit that he had drafted with
20 Agent Penman, that he had reviewed the night before executing the search, that had informed his
21 preparation of the operation plan, and that informed his briefing the other inspectors the morning
22 of the search to specify that their objective was to "seize a 12-gauge shot gun." (*See* Doc. Nos.
23 47 at ¶ 6; *id.* at 24.) Accordingly, the affidavit was incorporated by reference and accompanied
24 the warrant during the search. *See United States v. Taylor*, No. 17-cr-00191-JST, 2019 WL
25 281457, at *5 (N.D. Cal. Jan. 22, 2019) (concluding an FBI agent's affidavit accompanied an IRS
26 agent's search where the IRS agent "testified that he had access to the electronic version of the
27 affidavit on his Blackberry mobile device at the time of the search").
28 /////

Having concluded that the affidavit was incorporated, the court next "evaluate[s] the affidavit and the warrant as a whole, allowing the affidavit to 'cure' any deficiencies in the naked warrant." *SDI Future Health, Inc.*, 568 F.3d at 699. Although the court agrees with defendant that the three categories listed in Attachment B of the naked warrant are overbroad and lack particularity (evidence of violations of 18 U.S.C. § 922(g)(1); firearms [plural] and ammunition; and locked safes/devices capable of holding those items), the court must view the warrant and the affidavit together. As the court noted at the hearing on the pending motion (Doc. No. 48 at 15), Agent Penman's supporting affidavit very specifically provided that "[t]he search shall include the search and seizure of a firearm described as a '12-gauge shotgun'" (Doc. No. 30-1 at ¶ 7). Moreover, the affidavit detailed the factual basis for Agent Penman's and Inspector Croonquist's belief that there was probable cause to believe that a 12-gauge shotgun would be found in defendant's storage unit, not least of which was the fact that defendant told his father and girlfriend in a phone call mere days before the search that he had a 12-gauge shotgun in his storage unit. For these reasons, the court concludes that the 12-gauge shotgun was specifically listed as an item to be seized pursuant to the warrant, and thus, the affidavit cures the deficiency of the warrant for otherwise lacking specificity as to what was authorized to be seized.

The only remaining question is whether the issuing magistrate judge "had 'a substantial basis for concluding' that probable cause existed" to search defendant's storage unit for a shotgun. *See Gates*, 462 U.S. at 238–39. In other words, whether "given all the circumstances set forth in the affidavit . . . there is a fair probability that" the shotgun "will be found in" defendant's storage unit. *See Greenstreet*, 41 F.3d at 1309. Here too, the court readily concludes that there was probable cause to search defendant's storage unit for a 12-gauge shotgun.[5] Indeed, defendant's motion to suppress also appears to concede as much, with a heading titled: "The Facts Supported Probable Cause to Search for a 12-Gauge Shot Gun, Not Records/Documents or Any and All Types of Firearm or Ammunition." (Doc. No. 30 at 14.)

---

[5] Neither the government nor defendant address whether inspectors also had probable cause to search for ammunition for the shotgun, though Agent Penman's supporting affidavit did state that "[b]ased on [his] training and experience, 12-gauge shotguns and other firearms are commonly stored together with or in proximity to ammunition." (Doc. No. 30-1 at ¶ 21.)

Accordingly, the court will deny defendant's motion to suppress the shotgun that was seized during the search of his storage unit pursuant to the challenged warrant. To the extent defendant also intended to seek the suppression of the postal locks that were seized by the executing inspectors, defendant has not fully developed or supported any arguments that would justify suppression of that evidence, which appear to have been found in plain view during the execution of the search warrant.

## CONCLUSION

For the reasons explained above,

1. Defendant's motion to suppress (Doc. No. 30) is denied;
2. This case remains scheduled for status conference before Magistrate Judge Barbara A. McAuliffe on October 26, 2022 at 1:00 p.m.; and
3. The Clerk of the Court is directed to now reassign this case to U.S. District Judge Ana I. de Alba and the parties are advised that all future filings in this case shall bear the new case number of 1:21-cr-00136-ADA-BAM.

IT IS SO ORDERED.

Dated:   **October 19, 2022**                                 _Dale A. Drozd_
                                                              UNITED STATES DISTRICT JUDGE